IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JEFF ARBEIT, *et al.*,
*individually and on behalf of all those similarly situated*,
Plaintiffs,

v. Civil No. 3:25cv821 (DJN)

CAPITAL ONE, N.A., *et al.*,
Defendants.

**MEMORANDUM OPINION**

Plaintiffs Jeff Arbeit, Selena Kansal, Stuart Swanson, Keith Flowers, Susan Colowick, Ryan Baker and Aravind Senguttuvan (collectively, "Plaintiffs"), on behalf of themselves and similarly situated members of nationwide and state classes, bring this class action against Defendants Capital One, N.A. and Capital One Financial Corp. (collectively, "Capital One" or "Defendants"). Plaintiffs' Amended Class Action Complaint (ECF No. 31 ("Amended Complaint" or "Am. Compl.")) asserts seven claims against Capital One concerning the interest rates that it paid to its 360 Money Market account customers between 2019 and 2025.

This matter comes before the Court on Capital One's Motion to Dismiss the Amended Complaint (ECF No. 34 ("Motion to Dismiss" or "Motion")). For the reasons set forth below, the Court will GRANT the Motion to Dismiss (ECF No. 34) and will DISMISS the Amended Complaint.

# I. BACKGROUND

## A. Factual Background

At this stage, the Court must accept as true the facts set forth in the Amended Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving Capital One's Motion.

Plaintiffs are current or former holders of Capital One 360 Money Market accounts ("360 MMAs") with balances of $10,000 or more. (Am. Compl. ¶ 34.) Capital One launched its 360 MMA product in 2016. (*Id.* ¶ 42.) Capital One characterized this account as a "savings product," (*Id.* ¶ 48), and advertised it as having "one of the nation's top rates . . . for accounts with balances of $10,000 or more." (*Id.* ¶ 46 (emphasis removed).) Promotional materials described the 360 MMA as a "high-interest, fee-free" account with "savings growth for the long haul." (*Id.*) Before 2019, Capital One advertised the 360 MMA as offering the highest interest rate for customers who sought a Capital One savings accounts with a balance of $10,000 or more. (*Id.* ¶¶ 41, 50.) Notably, the 360 MMA offered a higher interest rate than Capital One's conventional online savings account, 360 Savings. (*Id.*) Though its interest rate was variable, until January 2020, the 360 MMA's interest rate remained closely related to the federal funds effective rate. (*Id.* ¶ 55, 57.) Between 2015 and 2019, that federal rate experienced significant increases, which were reflected in higher interest rates that Capital One paid to its 360 MMA depositors. (*Id.* ¶ 57.)

On or around September 16, 2019, Capital One introduced a new online savings account, the Capital One 360 Performance Savings account ("360 PSA"). (*Id.* ¶ 60.) Within a few days, Capital One removed all references to the 360 MMA and the 360 Savings account from its website. (*Id.* ¶ 61.) Selecting "View All Accounts" or "View All Savings Accounts" or "View

and Compare Rates" on Capital One's website's drop-down menu no longer permitted customers to obtain information about the 360 MMA. (*Id.*) Following the 360 PSA's introduction, Capital One lowered the interest rate for the 360 MMA from 2.0% APY to 1.9% APY, matching the 360 PSA's initial rate. (*Id.* ¶ 65.)

By January 2020, three months after the 360 PSA's launch, the 360 PSA interest rate began to exceed the 360 MMA rate for depositors with balances over $10,000. (*Id.* ¶ 66.) The gap between these interest rates grew over time, with a divergence of more than 3.5 percentage points by January 2024. (*Id.*)

From September 2019 through December 2020, Capital One gradually lowered the 360 MMA interest rate from 2.00% APY to 0.30% APY, freezing the rate at that level from December 2020 to June 2022. (*Id.* ¶ 69.) During that time frame, the 360 PSA's rate never dropped below 0.40%. (*Id.*) As the federal funds effective rate increased from approximately 0.08% in February 2022 to 5.33% in August 2024, Capital One increased the 360 PSA's interest rate from 0.399% to 4.169%. (*Id.* ¶ 70.) By contrast, Capital One raised the interest rate on the 360 MMA to only 0.797%. (*Id.*) While Capital One generally raised interest rates on the 360 PSA in response to market conditions, Capital One kept the 360 MMA's interest rate lower and sometimes froze the rate. (*Id.* ¶ 72.) Capital One did so despite maintaining identical provisions regarding customers' interest rates across both accounts' disclosure materials. (*Id.* ¶ 73.)

Capital One appears to have anticipated that some of its 360 MMA customers would be unhappy to find out that other Capital One depositors might be earning higher interest rates. (*Id.* ¶ 89.) When dealing with inquiries to that effect, Capital One instructed its customer service personnel not to tell 360 MMA depositors about the 360 PSA unless they explicitly asked. (*Id.* ¶ 90.) Capital One was also aware that most savings customers do not closely monitor their

savings accounts. (*Id.* ¶ 92.) Plaintiffs allege that Capital One schemed to "reap increased profits" at the expense of Plaintiffs' "lack of knowledge that they no longer earn[ed] the high interest rates [that] they were promised." (*Id.* ¶¶ 93–94.)

Plaintiffs highlight that Capital One maintained, as recently as December 2025, a section of its website under the title "Banking Basics." (*Id.* ¶ 84.) That site provides general information concerning different types of bank accounts, including money market accounts, and how such accounts compare with one another. (*Id.*) As of December 5, 2025, the Banking Basics website included the following statements about money market accounts:

- When you're considering a money market account vs. a high-yield savings account, you'll find them to be very similar at first glance. Both usually require a higher minimum deposit, both offer comparable interest rates and both usually have similar restrictions on the number of withdrawals you're allowed to make.

- For customers, a money market account works similar to a savings account: You deposit your savings into the account, you start earning returns and your money is available when you want it. So why the higher savings rate? What's the catch? Generally, the bank is giving you extra interest for keeping extra money in your account. The bank rewards you with the higher APY incentive if you meet certain restrictions, because the bank may loan your money out to those who need it or make other money market investments in the stock market.

- How do I choose the best money market account? Most major banks and many credit unions offer money market accounts, but they're not all the same. The first thing to consider is the savings rate. As you've seen, a higher savings rate can earn you more money.

- A money market account is a unique savings account that generally earns you a higher savings rate than traditional savings accounts.

- Also, with the higher savings return benefits of a money market account, there may be certain restrictions. Often, money market account savings can require a higher minimum balance than traditional savings accounts.

- [ . . . ] If you can't afford the minimum balance, a traditional savings account may suit you better.

(*Id.* ¶ 84.) Plaintiffs assert that, since Capital One offers the 360 MMA as its money market product, it is both reasonable and likely that 360 MMA depositors would believe that Capital One's general representations on the "Banking Basics" site concerning money market accounts apply specifically to their 360 MMAs. (*Id.* ¶ 85.) In Plaintiffs' telling, "Banking Basics" misled 360 MMA depositors, because their interest rates did not, in fact, compare to — let alone exceed — those paid to 360 PSA depositors. (*Id.* ¶ 86.)

Plaintiffs allege that they suffered monetary losses in the form of foregone interest payments that they would have received if Capital One had complied with its legal obligations under the Implied Covenant and the state statutes at issue. (*Id.* ¶ 99.)

**B. Procedural Background**

On October 6, 2025, Plaintiffs filed a class action complaint against Capital One. (ECF No. 1.) After Capital One moved to dismiss the original complaint, Plaintiffs filed an Amended Complaint on December 29, 2025, which constitutes the operative pleading in this matter. (ECF No. 31.) Plaintiffs' Amended Complaint contains seven counts, alleging breach of contract and the implied covenant of good faith and fair dealing (Count I), as well as violations of the Virginia Consumer Protection Act, Va. Code § 59.1-200 (Count II), New York General Business Law §§ 349, 350 (Count III), the Pennsylvania Unfair Trade Practices And Consumer Protection Law, 73 P.S. §§ 201-1–201-9.2 (Count IV), the Illinois Consumer Fraud And Deceptive Business Practices Act, 815 Ill. Comp. Stat. §§ 505 *et seq.* (Count V), the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.41 *et seq.* (Count VI), and the New Jersey Consumer Fraud Act (Count VII). Plaintiffs seek to represent a nationwide class of "[a]ll persons who have been Capital One 360 Money Market account holders during the Relevant Time Period," which the Amended Complaint defines as September 16, 2019 through December 29, 2025, and who "at

any point had a balance in their 360 Money Market account in excess of $10,000," as well as six state subclasses including all such individuals in the states where Plaintiffs reside. (*Id.* ¶¶ 101–08.)

Capital One filed the instant Motion to Dismiss on January 27, 2026, (ECF No. 34), with an accompanying memorandum in support. (ECF No. 35 ("Mem.").) Plaintiffs timely opposed the Motion, (ECF No. 36 ("Opp.")), and Capital One timely replied, (ECF No. 37 ("Reply")), rendering the Motion ripe for the Court's review.

## II. LEGAL STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint; it does not provide the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court must accept the well-pleaded factual allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court need not accept legal conclusions couched as factual allegations, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), nor "unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

Under Federal Rule of Civil Procedure 8(a), a complaint must state facts sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The complaint must state "more than labels and conclusions" or a "formulaic recitation of the elements," though the law does not require "detailed factual allegations." *Id.* Ultimately, the "[f]actual allegations

must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III. ANALYSIS

### A. Overview of Allegations and Arguments

The Court begins with an overview of Plaintiffs' primary theories of liability and the context surrounding this suit before turning to Capital One's Motion to Dismiss.

Plaintiffs allege that Capital One's 360 MMA Disclosures (ECF No. 35-1 (the "360 MMA Disclosures" or "Disclosures"), the agreement containing the governing terms for the 360 MMA, provide that "interest rates and annual percentage yields are variable and may change at any time at [Capital One's] discretion," but that the Disclosures do not relieve Capital One from its duty to "exercise contractual discretion honestly and in good faith." (Am. Compl. ¶¶ 120, 122.) Accordingly, Plaintiffs assert that Capital One's actions between September 2019 and December 2025 in relation to 360 MMA interest rates, including how it communicated (or failed to communicate) these rates to its depositors, violated the covenant of good faith and fair dealing implicit in its Disclosures. (*Id.* ¶¶ 119–26.) In addition, Plaintiffs assert that these actions also violated the consumer protection and unfair trade practices statutes listed above. (*Id.* ¶¶ 127–70.)

The Court understands Plaintiffs' primary theory of liability as follows. Capital One represented the 360 MMA to future accountholders as "high-interest" and "high-yield,"

providing "one of the nation's top savings rates" and "one of the nation's top rates . . . for accounts with balances of $10,000 or more," with a rate "comparable" to high-yield savings accounts. (*Id.* ¶ 95.) Capital One's representations suggested that 360 MMA depositors could "set" and "forget" their money, and that they could "rest easy knowing [their] money's safe and sound" for the "long haul[,]" without needing to closely monitor their interest receipts. (*Id.*) However, the 360 MMA's post-2019 interest rates were neither "high" nor among the "nation's top savings rates," and were not "even competitive compared to Capital One's own savings account products and money market accounts offered by other banks." (*Id.*) In Plaintiffs' view, Capital One's language and its actions, including its failure to specifically alert 360 MMA depositors to the existence of its higher yielding 360 PSA product, constitute deceptive misrepresentations and a bad faith exercise of its contractual discretion to set interest rates. (*Id.* ¶¶ 96, 125.) Based on Capital One's actions and statements, Plaintiffs contend that consumers reasonably believed that Capital One would maintain rates consistent with movements in the federal funds rate, that the 360 MMA "would continue to offer the nation's highest interest rates for higher balances, comparable to rates earned in high-yield savings accounts" like the 360 PSA, and that "Capital One's representations about the 360 Money Market interest rate would remain true over the entire period during which they held their accounts." (*Id.* ¶ 58.)

The Court reads Plaintiffs' Amended Complaint to also assert a related, alternative theory of liability. Plaintiffs allege that the introduction of the 360 PSA in September 2019, and Capital One's simultaneous removal from its website of any references to the 360 PSA's predecessor product, 360 Savings, caused significant confusion to 360 MMA depositors regarding the interest rates that they were earning. (*Id.* ¶¶ 61, 78.) Plaintiffs' assertions are premised on the following chain of inferences. At the time that Plaintiffs signed up for their 360 MMAs, Capital One

advertised this account as its highest interest liquid savings account. (*Id.* ¶ 77.) As part of these marketing efforts, Capital One repeatedly highlighted that the 360 MMA carried a higher interest rate than Capital One's other online savings account, 360 Savings. (*Id.* ¶ 78.) Based on the similarities between the 360 Savings account and the 360 PSA, including their similar names, and the removal of any information regarding the 360 Savings accounts from Capital One's website, 360 MMA holders visiting Capital One's website after September 2019 would have been confused into believing that the 360 PSA was, in fact, the same account as the previously advertised 360 Savings account. (*Id.* ¶¶ 61, 78.) That misperception, in turn, misled Plaintiffs into believing that their 360 MMAs were earning a higher rate of return than the 360 PSA, when the opposite was true. (*Id.*)[1]

Both parties cite extensively to *In re Capital One 360 Savings Account Interest Rate Litigation*, a recent multidistrict litigation matter before this Court involving some of the same Capital One account products. Case No. 1:24md3111 (DJN) (E.D. Va. June 20, 2024) (the "Capital One MDL" or "MDL"). In that case, the Court considered a motion to dismiss a class action complaint against Capital One that asserted a similar set of claims, including breach of the Implied Covenant and violations of state consumer protection and unfair trade practices statutes. *In re Cap. One 360 Sav. Acct. Int. Rate Litig.*, 779 F. Supp. 3d 666 (E.D. Va. 2024) (the "MDL MTD Opinion" or "MDL MTD Op."). That class action complaint alleged that Capital One had cheated 360 Savings accountholders out of interest income by creating the 360 PSA and

---

1 The Amended Complaint goes so far as to allege that Capital One "concealed that the 360 Performance Savings account offered a higher APY than the 360 Money Market account." (Am. Compl. ¶ 125.) The Court finds no factual basis for this allegation in the Amended Complaint. As such, the Court will limit its analysis on this issue to Plaintiff's theories that Capital One's actions regarding the 360 PSA involved confusion and deception, rather than outright concealment.

concealing that 360 Savings accountholders' "high interest" accounts were earning significantly less interest than the similarly named 360 PSAs. *Id.* at 682. The Court largely denied Capital One's motion to dismiss, including as to the Implied Covenant claim and the state consumer protection statutes at play in the instant litigation. *Id.* The Court rejected Capital One's argument concerning National Bank Act preemption, finding that "requiring banks not to engage in deception or fraud in setting the interest rates for savings accounts does no more than incidentally affect" Capital One's federally-protected exercise of its deposit-taking power. *Id.* at 691 (citation omitted, cleaned up). Assuming without deciding that Capital One possessed an express right to alter 360 Savings accountholders' interest rates at any time, the Court found that the plaintiffs plausibly alleged that Capital One had acted dishonestly in its exercise of that right. *Id.* at 702. The Court pointed to the fact that Capital One "kept [plaintiffs] in the dark by burying all references to 360 Savings and replacing that account with the new, similarly named 360 Performance Savings account." *Id.* at 703. The Court further found that Capital One's creation of the 360 PSA and the removal of all references to 360 Savings on its website rendered it "virtually impossible without unreasonable efforts" for accountholders to ascertain their actual interest rates, "since the website text reasonably misled Plaintiffs into believing that the posted rate continued to apply to their accounts." *Id.* at 704. The Court also found, on similar grounds, that the plaintiffs plausibly alleged unfair or deceptive conduct for purposes of the state statutory claims. *Id.* at 717–21.[2]

---

[2] The Capital One MDL resulted in a global settlement, which this Court approved as fair, reasonable and adequate on April 20, 2026. Order, *Capital One MDL* (Apr. 20, 2026), ECF No. 348. An appeal of the Court's Order approving the settlement remains pending before the Fourth Circuit. *Michelle Coles v. In re: Capital One 360 Sav. Acct. Int. Rate Litig.*, Case No. 26-1807 (4th Cir. June 25, 2026).

Against this backdrop, the Court now turns to Capital One's instant Motion. Capital One presents three main arguments in support of its Motion to Dismiss, which mirror the arguments made in the MDL. First, it argues that Plaintiffs' claims amount to an impermissible attempt to regulate Capital One's interest rate policies and customer disclosures via state law, and that the National Bank Act ("NBA"), 12 U.S.C. §§ 1 *et seq.*, preempts such claims. (Mem. at 15–19.) Second, Capital One asserts that Plaintiffs' Implied Covenant claim fails, because Plaintiffs fail to establish that Capital One acted dishonestly — a required showing where, as here, Plaintiffs' claims challenge the exercise of an express contractual right to modify interest rates, rather than the exercise of contractual discretion. (*Id.* at 20–25.) Finally, Capital One asserts that Plaintiffs fail to establish several key elements across all of their statutory claims, including the necessary element of deception. (*Id.* at 25–37.)

The Court finds in favor of Defendants. While Capital One's preemption arguments are inapplicable to Plaintiffs' claims, Capital One correctly asserts that it possessed an express right, under the 360 MMA Disclosures, to alter Plaintiffs' interest rates. Plaintiffs' allegations fail to establish that Capital One exercised that right dishonestly, warranting dismissal of Count I. The Court further finds that Plaintiffs fail to adequately plead deception, a necessary element for each of the statutory claims that Plaintiffs assert. Consequently, Counts II through VII warrant dismissal as well. The Court addresses each of these issues in turn.

### B. Preemption

Capital One argues that the NBA preempts Plaintiffs' claims to the extent that they seek to impose a legal duty on Capital One to pay a mandated interest rate or issue additional disclosures to its customers. (Mem. at 8.) The Court addressed and rejected Capital One's arguments for NBA preemption of similar claims in its MDL MTD Opinion. As explained

below, those findings warrant the rejection of Capital One's preemption arguments in the instant case as well.

The Court previously summarized the relevant legal principles surrounding NBA preemption as follows:

> "Business activities of national banks are controlled by the National Bank Act (NBA or Act), 12 U.S.C. § 1 *et seq.*, and regulations promulgated thereunder by the Office of the Comptroller of the Currency (OCC)." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 6 (2007). The NBA vests in nationally chartered banks specific enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24. OCC regulations specifically authorize national banks to "receive deposits and engage in any activity incidental to receiving deposits." 12 C.F.R. § 7.4007(a). Under the NBA, Congress created a "mixed state/federal regime[ ] in which the Federal Government exercises general oversight while leaving state substantive law in place." *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 530 (2009).
>
> The Supreme Court has interpreted national banks' enumerated and incidental powers "as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996). However, national banks remain "subject to state laws of general application in their daily business to the extent [that] such laws do not conflict with the letter or the general purposes of the NBA [or OCC regulations]." *Watters*, 550 U.S. at 11. While "[c]ourts generally apply a presumption against preemption in fields the states traditionally regulate," such a presumption does not exist in the context of national banking powers. *Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330–31 (4th Cir. 2006). A reviewing court "make[s] a practical assessment of the nature and degree of the interference caused by a state law" by looking to "the text and structure of the laws, comparison to other precedents, and common sense." *Cantero v. Bank of America, N.A.*, 602 U.S. 205, 219–20, 220 n.3 (2024).

MDL MTD Op. at 688.

In considering whether the NBA preempted the MDL plaintiffs' claims, the Court made the following two threshold findings. The Court first found that "any statute or claim purporting to impose" a duty to pay a mandatory interest rate "clearly would stand preempted as a significant interference with a national bank's power to 'receive deposits and engage in any activity incidental to receiving deposits.'" *Id.* at 691 (quoting 12 C.F.R. § 7.4007(a)). However,

the Court also found that federal law does *not* preempt the "duty not to engage in fraud or deception in setting interest rates for savings accounts," because "requiring banks not to engage in deception or fraud in setting [such] interest rates . . . does no more than incidentally affect the banks' exercise of their deposit taking power." *Id.* (citation omitted, cleaned up). On that basis, and following a detailed analysis that engaged with the relevant caselaw, the Court ultimately rejected Capital One's argument that the NBA preempted the MDL plaintiffs' claims. *Id.* at 698–99. The Court determined that "Plaintiffs' claims seek to impose a legal duty on Defendants to avoid deception and concealment in their dealings with customers and when setting interest rates on savings accounts," rather than to require Capital One to set specific interest rates or disclosures. *Id.* at 698. Such claims "do not 'significantly interfere' with [Capital One's] federal power to receive deposits," rendering Capital One's preemption argument inapposite. *Id.* at 698–99.

Turning to the instant case, Plaintiffs similarly assert that the NBA fails to preempt their claims, "because Plaintiffs do not allege, and do not ask the Court to find, that Capital One was required to pay 360 MMA accountholders specific interest rates." (Opp. at 16.) Further, to the extent that Capital One argues for preemption on the basis that Plaintiffs seek to regulate Capital One's disclosures to 360 MMA depositors, Plaintiffs assert that their assertions concerning Capital One's deficient disclosures "are simply facts serving to support Plaintiffs' allegations of Defendants' years-long pattern of deception," not an attempt to regulate what disclosures Capital One must issue to its customers. (*Id.* at 16–17.) Capital One disagrees, asserting that Plaintiffs' complaint "demands" a ruling that Capital One was required to set 360 MMA interest rates at a specific level, violating the principles articulated in the Court's MDL MTD Opinion. (Reply at

8–9.) Capital One also seeks to distinguish the applicability of the Court's MDL MTD Opinion by highlighting the factual differences between the two cases. (*Id.* at 9.)

The Court agrees with Plaintiffs. Capital One's arguments notwithstanding, the logic of the Court's MDL MTD Opinion applies with equal force to the instant case. Here, too, "Plaintiffs relied upon [Capital One's] 'high interest' label . . . and accordingly allege that they lost money that they otherwise could have earned." MDL MTD Op. at 693. Similarly, Plaintiffs allege that Capital One had a duty to act without fraud or deception against its depositors. Accordingly, as in its MDL MTD Opinion, the Court disagrees with Capital One's characterization of Plaintiffs claims in the instant litigation, which "do not seek to impose mandatory interest rates on national banks, but rather seek to impose a 'legal duty' upon Defendants to act without fraud or deception in setting the interest rates for their savings products." *Id.* at 693. While that duty certainly impacts the specific disclosures that Capital One must issue to its accountholders and the interest rates that it pays them, the Court finds — in line with its earlier opinion — that this duty fails to "significantly interfere" with Capital One's power to receive deposits, the relevant touchstone for NBA preemption. *Id.* at 691 n.4 (citing *Barnett Bank*, 517 U.S. at 33). Consequently, and for the reasons stated more fully in its MDL MTD Opinion, which the Court adopts and incorporates in full, the Court rejects Capital One's argument that federal law preempts Plaintiffs' claims in this litigation.

### C. Implied Covenant Claim (Count I)

The Court proceeds to consider Capital One's arguments concerning the merits of Count I, which alleges a breach of contract under the implied covenant of good faith and fair dealing. "Under Virginia law, every contract carries an implied covenant of good faith and fair dealing." *Rogers v. Deane*, 992 F. Supp. 2d 621, 633 (E.D. Va. 2014). A breach of that Implied

Covenant, however, "only gives rise to a breach of contract claim, not a separate cause of action." *Frank Brunckhorst Co. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 462 (E.D. Va. 2008). A claim for breach of the Implied Covenant requires "(1) a contractual relationship between the parties, and (2) a breach of the implied covenant." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). Here, the parties do not dispute that a contractual relationship existed between Capital One and Plaintiffs pursuant to the 360 MMA Disclosures. Therefore, the only question before the Court asks whether Plaintiffs have properly alleged a breach of the Implied Covenant.

Under Virginia law, the implied covenant of good faith and fair dealing protects a party's right "to receive the benefits of the agreement." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 611 (4th Cir. 2021) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2021)). Thus, the Implied Covenant prohibits a party from exercising "contractual discretion in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 542 (4th Cir. 1998) (applying Virginia law). The Implied Covenant does not, however, "prevent a party from exercising its explicit contractual rights." *Id.* Accordingly, under Virginia law, if a party possesses a discretionary power under a contract, "that party cannot act arbitrarily or unfairly" in exercising its discretion. *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013). But if a party has an express right under the contract, then "that party is only forbidden from acting dishonestly" in exercising that right. *Id.*[3]

---

[3] The Court notes that it remains disputed, across various courts, whether *any* implied covenant of good faith and fair dealing attaches to the exercise of express rights. *Compare Stoney Glen*, 944 F. Supp. 2d at 466 (forbidding a party from acting dishonestly in exercising a clear contract right), *with Ward's Equip. Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997) (holding that when "parties to a contract create valid and binding rights, an implied

Both parties agree that the Capital One 360 Money Market Account Disclosures (ECF No 35-1) constitute the relevant contract for purposes of the Court's inquiry. These Disclosures, authored by Capital One, set forth "the terms and conditions that you automatically agree to when you apply for a 360 Money Market account," (*id.* at 4), and include the following relevant provisions:

- The interest rates and annual percentage yields [applicable to 360 MMAs] are variable and may change at any time at our discretion.
- You can close your account at any time, for any reason.

(*Id.* at 3, 9.) Under the heading "Change to/waiver of terms," the Disclosures contain the following two additional provisions:

- We can add to, delete, or make any other changes we want to these terms at any time.
- We can cancel, change, or add products, accounts, or services whenever we want.

(*Id.* at 10.)

The parties disagree sharply on whether Capital One's actions in setting and adjusting the 360 MMA interest rate constituted the exercise of contractual discretion or an express right. This distinction is critical to Plaintiffs' claims under Count 1, given the significantly lower burden for Plaintiffs to establish breach under the contractual discretion standard, rather than the express

---

covenant of good faith and fair dealing is inapplicable to those rights") *and In re Cap. One Bank Credit Card Int. Rate Litig.*, 51 F. Supp. 3d 1316, 1345 (N.D. Ga. 2014), *as corrected* (Nov. 3, 2014), *aff'd sub nom. Barker v. Cap. One Bank* (USA), N.A., 622 F. App'x 894 (11th Cir. 2015) (characterizing *Virginia Vermiculite* as holding that "the covenant cannot bar a party for exercising its explicit contractual rights"). While the Court follows this Court's precedent, in *Stoney Glen* and elsewhere, to find that the Implied Covenant prohibits dishonest acts when a party exercises its express contractual rights, the Court acknowledges the differing views espoused by Virginia and federal courts and the potentially unstable legal ground on which this —largely federal-courts-driven — jurisprudence stands.

right standard. Accordingly, the Court must first determine whether Capital One's actions here implicate its express contractual right or merely constitute an exercise of contractual discretion.

### 1. Express Right vs. Contractual Discretion

Plaintiffs argue that Capital One exercised contractual discretion, rather than an express right, when setting and adjusting the 360 MMA interest rate. Plaintiffs' argument focuses on the Disclosures' provision declaring that the 360 MMA's "interest rates and annual percentage yields are variable and may change at any time *at our discretion*." (ECF No. 35-1 at 3 (emphasis added).) In Plaintiffs' view, "'discretion' means discretion." (Opp. at 19.) Plaintiffs assert that Capital One's contrary interpretation seeks to read this "discretion" language out of the agreement, rendering it mere surplusage — an approach at odds with Virginia law's general preference to give meaning to every word in a contract. (*Id.*) Plaintiffs also highlight that Capital One, as the exclusive author of the Disclosures, could have granted itself an express contractual right to change interest rates by omitting any references to "discretion," but clearly chose not to do so. (*Id.*) Finally, Plaintiffs posit that, under Virginia law, non-discretionary rights only arise "upon the occurrence of a specified event," a scenario at odds with the facts in this case, where no threshold or triggering event occurred to prompt Capital One to change the 360 MMA interest rates. (*Id.* at 20 (citing *In re Health Diagnostic Lab., Inc.*, 2018 WL 4676339, at *11 (Bankr. E.D. Va. Sept. 26, 2018)).)

Capital One, by contrast, asserts that the Disclosures grant it "the express right to adjust 360 MMA's interest rate." (Mem. at 21.) In support, Capital One points to the broad language contained in the Disclosures that permits Capital One to "add to, delete, or make any other changes we want to these terms at any time," which includes the ability to "cancel, change, or add products, accounts, or services whenever we want." (ECF No. 35-1 at 10.) Capital One

asserts that a change in the MMA's interest rate constitutes such a change of terms and thus falls within its express right to "change" the 360 MMA's "terms" as it pleases. (Reply at 10–11.) Concerning the Disclosures' reference to "discretion," Capital One argues that discretion in how it exercises its right to change the terms of the 360 MMA, including interest rates, does not transform this express right into something less. (Reply at 11 (citing *Teitz v. Va. Elec. Power Co. (In re Buffalo Coal Co.)*, 2010 WL 724702, at *4 (Bankr. N.D. W. Va. Feb. 26, 2010)).) Capital One also references an out-of-circuit case, *In re Cap. One Bank Credit Card Int. Rate Litig.*, 51 F. Supp. 3d 1316 (N.D. Ga. 2014), *as corrected* (Nov. 3, 2014), *aff'd sub nom. Barker v. Cap. One Bank* (USA), N.A., 622 F. App'x 894 (11th Cir. 2015), where, applying Virginia law, the court adopted Capital One's position in a dispute concerning Capital One's credit card interest rates, finding that "the discretion granted under the Agreement is absolute and uncontrolled and therefore . . . the Plaintiffs have not stated a claim for breach of the implied covenant of good faith and fair dealing." *Id.* at 1345.

The Court finds neither side's arguments wholly persuasive. Although Plaintiffs validly emphasize the inclusion of the word "discretion" in the Disclosures, their arguments fail to address the Disclosures' expansive and unlimited grant of authority allowing Capital One to change the account's terms and services however and whenever it wants, and how this expansive contractual authority interacts with such "discretion." Capital One, on the other hand, fails to substantively explain how the Disclosures' use of the word "discretion" impacts the analysis — essentially suggesting that its right to change the account terms renders that provision meaningless, but never explaining why the Disclosures make reference to "discretion" in the first place. Further, neither party cites a case that addresses the precise tension implicit in (1) assigning a broad grant of unilateral modification authority to one party and (2) including a

separate provision suggesting that this party exercise "discretion" in taking certain actions pursuant to that authority.[4] As a result, the Court finds the Disclosures ambiguous on this question and turns to applicable principles of Virginia law to resolve this ambiguity.

"It is a basic tenet of Virginia law that the courts, when interpreting a contract, construe it as written and do not add terms the parties themselves did not include." *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707, 714 (Va. 2012) (internal citations omitted and cleaned up). Where contractual provisions conflict, such provisions should be "harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein." *Id.* at 713. That approach notwithstanding, the Virginia Supreme Court has reiterated that it "will not insert by construction, for the benefit of a party, a term not express in the contract." *Id.* at 714. While "Virginia courts have often explained that any ambiguity in a written contract must be construed against the drafter of the agreement," *Goldkress Corp. v. Orthopaedic & Spine Ctr.*, No. 0670-16-1, 2016 WL 7209848, at *15 n.17 (Va. Ct. App. Dec. 13, 2016) (citing *Cappo Mgmt. V, Inc. v. Britt*, 711 S.E.2d 209, 211 (Va. 2011), the Supreme Court of Virginia has clarified that this rule of construction only applies where other such rules fail to resolve the question of intent and the "evidence is in equipoise." *Robinson–Huntley v. George Washington Carver Mut. Homes Ass'n, Inc.*, 756 S.E.2d 415, 419 n.* (Va. 2014).

Applying these principles to the 360 MMA Disclosures, the Court finds that the most harmonious reading of the conflicting provisions provides that the Disclosures grant Capital One an express right to change its interest rates as it pleases, without implied limitations beyond the requirement that it may not act dishonestly in exercising that right. As a threshold matter, the

---

4 While *In re Cap. One Bank Credit Card Int. Rate Litig.* stands most closely on all fours with the facts of the instant matter, the account disclosures in that case did not contain "discretion"-based language, limiting the relevance of that court's analysis to this case.

Court rejects Plaintiffs' surplusage arguments, since either party's reading would render parts of the Disclosures superfluous. The provisions in question — Capital One's unfettered right to make changes to 360 MMA terms and services, and Capital One's promise to adjust interest rates as an exercise of "discretion" — are essentially contradictory: Capital One either granted itself an express right to change interest rates as it pleases, or it limited its freedom to do so by subjecting itself to the Implied Covenant's strict limits on arbitrary and unfair actions; it did not do both. As such, either reading of the Disclosures inevitably creates redundancy, rendering the canon against surplusage unhelpful here.[5] *See Bufkin v. Collins*, 604 U.S. 369, 387 (2025) (internal citations omitted) ("The canon against surplusage can be meaningful when a competing interpretation would avoid superfluity. But, when both interpretations involve the same redundancy, the canon against surplusage simply does not apply.).

Looking instead to the contract as a whole, the Court finds it evident that Capital One, as the drafting party, intended for the Disclosures to preserve its right to unilaterally change its terms, products and services, without any additional implied limitations. The Disclosures' repeated use of expansive, all-encompassing language strongly supports this finding. (*See, e.g.*, ECF No. 35-1 at 9 (emphasis added) ("We can close your account *at any time, for any reason and without advance notice*"); at 10 (emphases added) ("[W]e can use all or any part of the money from your . . .accounts to pay any amounts you owe us"; "We can add to, delete, or make *any other changes we want* to these terms *at any time*"; "We can cancel, change, or add products,

---

[5] The Court also notes the Supreme Court's repeated statements concerning the limited utility of the canon against surplusage. *See, e.g.*, *United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007) ("Our hesitancy to construe statutes to render language superfluous does not require us to avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage"); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("The canon against surplusage is not an absolute rule.").

accounts or services *whenever we want*"; "We can waive *any of our rights* under these terms *whenever we want*"; "[W]e don't assume *any responsibility* for your account beyond reasonable care").) Such unrestricted language even appears in the sentence concerning Capital One's discretionary interest rate adjustments: interest rates "are variable and may change *at any time* at our discretion." (*Id.* at 3 (emphasis added).) This broad language concerning interest rates changing "at any time" may be read in harmony with the phrase "at our discretion" to suggest that the decision to adjust rates *is entirely up to Capital One*, instead of imposing a limitation on Capital One to exercise reasonable discretion to do so. Such a reading comports not only with the literal meaning of the text, but also with the broad and expansive language employed throughout the Disclosures that evinces Capital One's clear intent to retain sweeping control over its products. By contrast, construing the phrase "at our discretion" as a purposeful choice by Capital One to limit its own authority to adjust interest rates in accordance with a strict application of the Implied Covenant would contradict the overall thrust of the Disclosures and Capital One's intent to exercise control over its products as it chooses. The Court struggles to square such a reading with a set of contractual provisions that speak so clearly and consistently to the contrary.[6]

The Disclosures' expansive language shares significant similarities with the contractual provision at issue in *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610 (E.D. Va. 2009). There, this Court found that a provision permitting one party to terminate purchase orders "for any reason without penalty upon written notice" demonstrated that "the contract expressly

---

6 Where, as here, the contractual language clearly evinces the drafter's intent to create an express right, the Court need not construe the contract against Capital One as the drafter of the agreement. *Robinson–Huntley*, 756 S.E.2d at 419 n.*.

gave [the defendant] the right to terminate the purchase orders at will," and that consequently, the plaintiff could not "attempt to rewrite the purchase orders to amend a term that proves unfavorable" by invoking the Implied Covenant. *Id.* at 620. The Court cited approvingly to *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997), where the Fourth Circuit found that a party to a contract terminable at will "could not rely upon 'an implied duty of good faith and fair dealing to override explicit contract terms.'" *Skillstorm*, 666 F. Supp. 2d at 620. Here, the Disclosures' expressly broad grant of authority, including Capital One's ability to change terms at will, similarly do not countenance a finding that such rights ought to be overridden by the Implied Covenant, just because they now "prove[] unfavorable" to Plaintiffs. *Id.*; *see also Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997) (holding that the Implied Covenant "cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist"); *Monton v. Am.'s Servicing Co.*, No. 2:11CV678, 2012 WL 3596519, at *7 (E.D. Va. Aug. 20, 2012) ("[T]he covenant does not compel a party to take affirmative action not otherwise required under the contract, does not establish independent duties not otherwise agreed upon by the parties, and cannot be invoked to undercut a party's express contractual rights.")

The Court's reading of the Disclosures also does not implicate the concerns articulated by the Fourth Circuit in *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut*, 156 F.3d 535 (4th Cir. 1998). There, the Fourth Circuit held that a provision in a contract between landowners and a mining concern that vested the concern with "sole discretion" to decide whether to mine the landowners' land carried with it an implied duty of good faith under Virginia law. *Id.* at 541–42. The court rested its conclusion in part on a Virginia Circuit Court case's finding that "the implied duty of good faith is particularly important in the context of mining leases, where

the landowners must necessarily leave the decisionmaking process to the expertise of mining companies." *Id.* at 542 (quoting *Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 1993 WL 13029827, at *3 (Va. Cir. Ct. 1993)). That case, in turn, explains the strong public policy rationale underpinning its finding: "[w]ithout such an implied duty of good faith to protect them, landowners would be unwilling to sign over control of their property to mining companies, and the utilization of mineral resources would be severely hampered as a result." *Brandy Farm*, 1993 WL 13029827 at *3.

The concerns animating *Virginia Vermiculite* and *Brandy Farm* do not compel the conclusion that Capital One's Disclosures must be read as subject to the more rigorous Implied Covenant. While the Disclosures are indisputably one-sided in granting Capital One sole decision-making power, Plaintiffs — as Capital One accountholders — are under no obligation to "leave the decisionmaking process" to Capital One when it comes to their funds. *Virginia Vermiculite*, 156 F.3d at 542. Rather, as the Disclosures unambiguously set forth, accountholders are free to "close [their] account at any time, for any reason" and make their own decisions about how their money should be invested. (ECF No. 35-1 at 9.) Nor would the Court's construction of the Disclosures render customers "unwilling to sign over control" of their funds, so long as they remain able to (1) ascertain what interest rate their funds are earning and (2) remove their funds anytime they please. *Brandy Farm*, 1993 WL 13029827 at *3. Since neither concern articulated by *Virginia Vermiculite* and *Brandy Farm* is implicated here, the Court finds the rationales animating these cases distinguishable and inapposite.[7]

[7] The Court also rejects Plaintiffs' suggestion that express rights only arise "upon the occurrence of a specified event." (Opp. at 20 (citing *In re Health Diagnostic Lab., Inc.*, 2018 WL 4676339, at *11.) As a threshold matter, Plaintiffs' claim relies on a single bankruptcy case, which, in turn, cites no legal authority in support of this point. Further, the Court finds that Plaintiffs overread the Bankruptcy Court's pronouncement. That court sought to contrast

Finally, the Court notes that the United States District Court for the Northern District of Georgia, confronting the fact pattern most analogous to the instant case, arrived at the same construction of a similarly expansive provision. In considering whether Capital One's right to adjust credit card interest rates was subject to the Implied Covenant under Virginia law, that court found that Capital One possessed an express right to set these rates as it wished, since the relevant agreement "explicitly authorizes [Capital One] to change any portion of the Agreement, including annual percentage rates, at any time." *In re Cap. One Bank Credit Card Int. Rate Litig.*, 51 F. Supp. 3d at 1345. Stated differently, where "the discretion granted under the Agreement is absolute and uncontrolled," the Implied Covenant does not apply, since "[i]f a party has an explicit contractual right, the decision to exercise the right cannot be deemed 'discretionary.'" *Id.* While the agreement in that case did not expressly include the word "discretion," the Georgia court's recognition of an express right to change interest rates on the basis of broad language in the contractual agreement further supports the Court's reading of the Disclosures here.[8]

For all of these reasons, the Court agrees with Capital One and finds that the 360 MMA Disclosures grant Capital One an express right to adjust the 360 MMA interest rate.

---

discretionary rights — which "do not arise based on the occurrence of an objective, undisputed event," but are instead "committed to the party's determination, discovery, or will" — with non-discretionary rights that may be tethered to the occurrence of a specific event. *In re Health Diagnostic Lab., Inc.*, 2018 WL 4676339, at *11. The Bankruptcy Court did not state, and does not appear to imply, that *all* express rights are necessarily non-discretionary rights. As such, Plaintiffs' invocation of *Health Diagnostic* suggests a false dichotomy, rendering it inapplicable to the case at hand.

[8] *But see Flores v. Bank of Am., N.A.*, No. 18-CV-2527-WJM-KLM, 2019 WL 2470923, at *11 (D. Colo. June 13, 2019) (disagreeing with the Northern District of Georgia's holding and remaining "skeptical that 'absolute and uncontrolled' discretion under a contract exists in any jurisdiction that implies a covenant of good faith and fair dealing — at least not without an explicit waiver of the implied covenant (assuming such waivers are permitted)").

Consequently, the Court finds that Plaintiff's claims involve Capital One's exercise of an express right, not an exercise of contractual discretion. Under Virginia law, the Implied Covenant therefore restricts Capital One's exercise of that right only to the extent that Capital One exercised its right dishonestly.

**2. Dishonesty**

Having established that Capital One's actions in setting and adjusting 360 MMA interest rates involved the exercise of an express right, the Court proceeds to consider whether the Amended Complaint plausibly alleges that Capital One acted dishonestly in its exercise of that right. As explained below, Plaintiffs' allegations fall short of that bar, mandating dismissal of Count I.

**a. Parties' Arguments**

Plaintiffs' arguments primarily focus on Capital One's purported efforts to obfuscate its actions around 360 MMA interest rates and keep its customers in the dark as to the level of these rates. (Opp. at 21 (citing *Marcus v. Dennis*, 2022 WL 1527524, at *5 (E.D. Va. May 13, 2022), for the proposition that "[d]ishonesty can be established where it is pleaded that a defendant took steps to ensure that the Plaintiffs remained in the dark as to the truth.").) Specifically, Plaintiffs assert that Capital One's conduct "cultivated reliance and lured Plaintiffs into a false sense of security" that they would receive high interest returns on their deposits indefinitely. (*Id.*) Plaintiffs specifically invoke Capital One's references to 360 MMA accountholders earning "best" or "top" rates, and its purported encouragement to those accountholders to "set" and "forget" their money in a 360 MMA. (*Id.* at 21–22.) Once those accountholders relied on its representations, Capital One then sought to prevent its customers from realizing that 360 MMAs no longer provided the high interest that had been promised by removing all relevant information

about 360 MMAs from its website while continuing to maintain, in the "Banking Basics" section of its website, that money market accounts were generally "similar" and "comparable" to high-yield savings accounts. (*Id.* at 22.) Plaintiffs assert that Capital One's directive to customer service representatives *not* to affirmatively disclose the disparity between 360 MMA and 360 PSA interest rates further demonstrates its efforts at obfuscation. (*Id.*) Plaintiffs reject the argument that 360 MMA accountholders could have discovered the difference in interest rates between the 360 MMA and the 360 PSA on their own, arguing that the efforts required to obtain that information would have been extensive and unreasonable. (*Id.* at 24.) Finally, Plaintiffs assert that Capital One breached its promise to provide a "nationally competitive interest rate," further supporting a finding of dishonesty. (*Id.* at 27.)

Defendants counter by arguing that Plaintiffs' allegations concern only extra-contractual misrepresentations and fail to establish dishonesty with respect to the 360 MMA Disclosures. (Mem. at 24; Reply at 14.) According to Capital One, nothing in the Disclosures promised superior interest rates; as such, any failure to provide such rates does not constitute the dishonest exercise of its express right to alter the Disclosures' terms — the relevant inquiry under the Implied Covenant. (Mem. at 24–25.) Quite to the contrary, Capital One highlights that the Disclosures clearly specify that interest rates would be variable, undermining any argument that rate adjustments constitute dishonest behavior. (*Id.* at 25 (citing Am. Compl. ¶ 73).) Capital One also underscores that the 360 MMA interest rate appears in every accountholder's account statement, and that therefore, "Plaintiffs could have dispelled any confusion" purportedly created by the launch of the 360 PSA "by comparing the 360 Performance Savings advertised interest rate with the 360 MMA interest rate on their account statements." (*Id.*) Finally, the 360 MMA Disclosures do not require Capital One to disclose the existence of any other account product, let

alone how any other product's interest rate compares to the 360 MMA. (Reply at 15.) On that basis, Capital One urges the Court to reject Plaintiffs' assertion that it exercised its rights under the 360 MMA Disclosures dishonestly. (*Id.*)

Defendants' argument cites extensively to this Court's finding of dishonesty in the MDL and asserts that the significant factual differences between the two cases establish the need for a different result here. Centrally, Capital One highlights that the Court's finding of dishonesty in the MDL rested on its conclusion that Capital One's actions prevented 360 Savings accountholders "from identifying that the advertised Capital One high interest savings rate no longer applied to their [360 Savings] accounts" and from "making an informed decision about where to maintain their savings." (Mem. at 21 (citing MDL MTD Op. at 703).) Capital One also points to language in the MDL MTD Opinion emphasizing that the "similar sounding 360 Performance Savings account and the replacement and removal of any reference to 360 Savings on the website made such comparison [of interest rates] virtually impossible without unreasonable efforts, since the website text reasonably misled Plaintiffs into believing that the posted rate continued to apply to their accounts, even though it no longer did." (*Id.* at 22 (quoting MDL MTD Op. at 704).) Finally, Capital One highlights that the Court's finding of dishonesty was based, in part, on "facts . . . suggest[ing] that CONA created an account that would reasonably cause confusion and then concealed information that would otherwise lead consumers to discover the distinction between the two savings accounts." (*Id.* (quoting MDL MTD Op. at 702–03).) According to Capital One, none of those considerations apply in the instant case: the names of the 360 MMA and the 360 PSA are not similar, let alone indistinguishable; Plaintiffs had direct access to information about the different interest rates from the website and their monthly statements, and could thus easily compare the rates across

accounts; the accounts possessed different structures and features; and the accounts were not "otherwise identical." (*Id.* at 22–23.) Accordingly, Capital One argues that the Court must find that Capital One did not act dishonestly in the exercise of its express right to change interest rates here. (*Id.* at 23.)

**b. Statements in Question**

Plaintiffs' claims of dishonesty rely substantially on Capital One's alleged representations to prospective and current accountholders. To properly assess the parties' arguments concerning Capital One's alleged dishonesty, the Court must first parse the statements that Plaintiff attributes to Capital One and the context within which these statements appeared. As the Court's review demonstrates, Plaintiffs' selective quotations from Capital One's materials stretch the meaning and reasonable effect of some of these statements beyond their natural reach. Consequently, the Court declines to consider several of these statements and instead relies only on a subset in its analysis of Plaintiffs' substantive claims. *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (the Court need not accept "unwarranted inferences, unreasonable conclusions, or arguments" from a plaintiff's complaint.)

The Amended Complaint summarizes the offending statements by Capital One as follows:

> Since at least 2016 [Defendants] have advertised the 360 Money Market account as offering "one of the nation's top savings rates," and as a "high-interest," "high-yield" account that consumers could "set," "forget" and "rest easy knowing [their] money's safe and sound" for the "long haul."
>
> From at least August 2018 through the present, Capital One[] touted "the higher savings return benefits of a money market account," and advertised that money market accounts and high-yield savings accounts "both offer comparable interest rates." Capital One encouraged consumers who "already have a minimum balance" "to open a money market account to take advantage of higher interest" and stated that "the main difference" between money market savings accounts and high yield savings accounts was that money market accounts were for "long-term savings

> goals" and high-yield savings accounts were for "shorter-term goals." But that the "bottom line" was "[t]here aren't too many differences between these types of accounts."
>
> [. . .]
>
> Capital One specifically advised consumers who wanted to create a "rainy day fund," a type of account that is meant to be set aside for unexpected expenses, that a money market account would be the right fit.
>
> [. . .]
>
> From April 2016 to February 2018, the web site stated that "[o]ur two savings products, 360 Savings and 360 Money Market, have no fees, no minimums, and no catches. Your money will earn much more than what it would in an average savings or money market account."
>
> [. . .]
>
> Capital One represented[ that] news of higher interest rates set by the Federal Reserve means more money for depositors: "[f]or people with savings accounts, a hike in the interest rate could be good news. It means the money in the bank could earn more each month. When you see news of a federal interest rate hike, it can be a good time to deposit more money into your savings."

(Am. Compl. ¶¶ 2–3, 45, 48, 56.)[9] The Amended Complaint and Plaintiffs' opposition brief refer back to these statements repeatedly, characterizing Capital One as pitching a "'set it and forget it' opportunity," a "'rainy day' fund," and an "account that allowed customers to 'rest easy knowing [their] money's safe and sound' 'for the long haul,'" among other promises. (Opp. at 11.)

As a threshold matter, the Court finds Plaintiff's oft-repeated suggestion that Capital One told 360 MMA depositors to "set and forget" their money to constitute an improper characterization of Capital One's statements and disregards it for purposes of the instant analysis. Plaintiffs' characterization directly contradicts Capital One's actual words. Capital One told

---

9 While Plaintiffs also refer to various other statements from Capital One's materials, those other references convey substantially the same representations as the statements listed here.

prospective accountholders: "*Don't* just set it and forget it — grow it." Capital One, *What's An Online 360 Money Market® Account (MMA)?* (dated Sept. 5, 2019) [https://web.archive.org/web/20190905074528/https://www.capitalone.com/bank/savings-accounts/online-money-market-account/] (emphasis added). Plaintiffs' claim that Capital One encouraged its customers to "set and forget" their money, when it actually told them *not* to, defies common sense and is profoundly misleading. The Court ignores it accordingly.

The same holds true for Plaintiffs' assertion that Capital One induced the reliance of its 360 MMA depositors by telling them that they could "rest easy knowing [their] money's safe and sound" — an assertion that Plaintiffs repeat five times in their Amended Complaint and another three times in their opposition brief. (Am. Compl. ¶¶ 2, 24, 46, 95, 124; Opp. at 10, 11, 22.) Plaintiffs extract this statement from a 2016 Capital One webpage encouraging prospective customers to open 360 MMA accounts, which included the following text:

> 360 Money Market's a high-interest, fee-free online and mobile account, so you've got savings growth for the long haul. And since it's FDIC-insured, you can rest easy knowing your money's safe and sound.

Capital One, *360 Money Market* (last modified on Oct. 12, 2016) [https://web.archive.org/web/20161012020417/https://www.capitalone.com/online-money-market-account/]. Plaintiffs' selective quotation omits the critical predicate for why potential 360 MMA depositors could "rest easy:" their funds would be FDIC-insured. Conversely, nothing about this statement suggests that Capital One's interest rates or any other aspect of the 360 MMA provided grounds for "rest[ing] easy." Plaintiffs pull this statement out of its clear textual context to misleadingly argue that it somehow induced reliance in a particular interest rate policy. The Court disregards it accordingly.

The Court also rejects Plaintiffs' repeated invocation of various quotations from Capital One's "Banking Basics" webpage in support of its claims of dishonesty and deception. These quotations include the above-cited statements that money market accounts are generally better suited to long-term savings goals, that there "aren't too many differences" between money market and high-yield savings accounts, that money market accounts generally enjoy higher interest rates than savings accounts, and that hikes in the federal effective rate "could be good news" for savings account holders. (*See, e.g.,* Am. Compl. ¶¶ 3, 39.) The "Banking Basics" portion of the Capital One website offers an array of articles on elementary banking concepts, including how to open an account, how to transfer funds, and how interest works. Capital One, *Banking Basics* (last accessed Aug. 12, 2026), https://www.capitalone.com/bank/money-management/banking-basics/. These articles, targeted to a broad audience that clearly extends beyond Capital One's current customer base,[10] speak in the abstract about relevant account *types* without referencing the Capital One products at issue here.

The Court finds that the Banking Basics page's generalized language — repeatedly using words like "generally," "may," or "often" — and the complete absence of any references or links to Capital One's own product offerings amply demonstrate its purpose as an educational resource on bank accounts *generally*, rather than its applicability to the Capital One 360 MMA specifically. Nothing about the information on this website suggests anything close to a binding promise governing how one of Capital One's specific products would perform. Apparently anticipating this objection, Plaintiffs assert that, "[g]iven that Capital One itself offers the 360

---

[10] The Court notes that the Banking Basics page currently features an article titled "Telling Your Bank It's Over." Capital One, *Banking Basics: Telling Your Bank It's Over* (last accessed Aug. 12, 2026), https://www.capitalone.com/bank/money-management/banking-basics/closing-a-bank-account/. This article provides advice on how to end one's relationship with a bank — hardly an article that Capital One would be directing towards its own depositors.

Money Market accounts, it is not only reasonable — but likely — that existing 360 Money Market account holders would understand that [the Banking Basics] representations relate to ***their*** money market accounts." (Am. Compl. ¶ 85 (emphasis in original).) Plaintiffs offer no support for this bald assertion, and the Court rejects it as unsubstantiated. Consequently, the Court disregards the statements cited by Plaintiffs from the "Banking Basics" webpage for purposes of assessing whether Capital One engaged in dishonest or deceptive practices as to its 360 MMA interest rates.

Having excluded the above statements from its review, the Court is left to consider Capital One's pre-2019 statements that the 360 MMA held one of the nation's top savings rates, that it constituted a "high-interest" (or "higher interest"), "high-yield" account for the "long haul," equivalent to a "rainy day fund," and that funds in a 360 MMA would earn "much more than . . . in an average savings or money market account." (Am. Compl. ¶¶ 2, 45, 48.) The Court proceeds to analyze Plaintiffs' allegations of dishonesty as to these remaining statements.

**c. Analysis**

Viewing the remaining statements in tandem with Plaintiffs' allegations concerning Capital One's actions in (i) creating the 360 PSA, (ii) removing information about 360 MMA from its website and (iii) subsequently adjusting the 360 MMA's interest rates, the Court finds that Plaintiffs fail to adequately plead that Capital One acted dishonestly with regard to the 360 MMA interest rates during the relevant timeframe. As a baseline matter, Plaintiffs do not allege that Capital One made any of the relevant statements concerning the 360 MMA's high interest rate and its purportedly superior earnings potential *after* Capital One's introduction of the 360 PSA in 2019; rather, all of these statements predate the relevant timeframe during which Plaintiffs accuse Capital One of acting dishonestly. In fact, just a few days after Capital One

introduced 360 PSA, it purportedly removed all "information about" the 360 MMA account from its customer-facing website. (Am. Compl. ¶ 61.) Further, Plaintiffs do not allege that any of Capital One's statements were false when made or while they appeared on Capital One's website before the introduction of the 360 PSA. These threshold facts cut against a finding that Capital One's pre-2019 statements about the 360 MMA's interest rates evince dishonesty in its post-2019 actions.

Even assuming that accountholders believed that Capital One's pre-2019 marketing statements promised them competitive or high interest rates into perpetuity, the Court refuses to find that Capital One's subsequent adjustments to these rates constitute a dishonest exercise of its rights under the 360 MMA Disclosures, given the clear text of that document. Any assumption by a 360 MMA depositor about a lifetime guarantee of high interest rates would have been instantly dispelled by reading the Disclosures, which specify, in simple English, that interest rates are variable and that the terms and services provided by Capital One can be changed, by Capital One, at any time and for any reason. (ECF No. 35-1 at 3, 10.) This clear language precludes a finding that Plaintiffs reasonably believed that Capital One's marketing constituted a perpetual promise of high interest rates. The failure to honor such an illusory promise does not constitute dishonesty for purposes of the present inquiry.

Plaintiffs also fail to plausibly plead that Capital One kept 360 MMA accountholders "in the dark" as to their interest rates or misled them into thinking that they received higher interest rates than they did. *Marcus*, 2022 WL 1527524 at *5. Despite Capital One's decision to remove information concerning 360 MMA interest rates from its website, 360 MMA depositors could still obtain their rate from their individual account statements. Plaintiffs do not plead that they

were unable to access these statements.[11] Further, Plaintiffs also do not plead that Capital One's customer service agents would have withheld this information from them if asked. Plaintiffs' failure to remain abreast of their interest rates says more about their own level of engagement with their finances than any purported dishonesty by Capital One.

In this vein, Plaintiffs' arguments concerning the introduction of the 360 PSA and the purported confusion it created among 360 MMA accountholders constitute a red herring. The 360 PSA constituted a new account type, a high yield savings account, that was clearly distinguishable from the 360 MMA accounts held by Plaintiffs. While the Court found in its MDL MTD Opinion that the MDL plaintiffs plausibly pled that Capital One had been dishonest in how it acted towards its 360 Savings accountholders, that finding cannot be transposed onto the instant litigation via Plaintiffs' attenuated chain of inferences regarding a hypothetical expectation that 360 MMAs would necessarily earn a higher rate of interest than this new, different savings account. (Am. Compl. ¶ 78.) The Court finds Plaintiffs' allegations on this point implausible; the fact that no named Plaintiff appears to have experienced such confusion only serves to deepen the Court's skepticism.

Indeed, the stark factual differences between this litigation and the MDL strongly support a divergent outcome. Plaintiffs fail to plausibly allege confusion of the sort existing in the MDL, where countless 360 Savings accountholders were actively confused about whether the newly introduced 360 PSA was, in fact, the 360 Savings account that they already held, given the similar names and the overnight disappearance of any references to 360 Savings on the website. MDL MTD Op. at 704. Based on that confusion, a 360 Savings accountholder trying to

---

[11] In fact, at least one Plaintiff indicates that when she reviewed her accounts, she saw her interest rate and subsequently transferred her funds to a 360 PSA account, based on her review of the interest rate that she was receiving on her 360 MMA accounts. (Am. Compl. ¶ 16.)

ascertain her interest rate on the Capital One website would have reasonably been deceived into thinking that the 360 PSA rates applied to her.

Such confusion could not (and did not) occur here. No 360 MMA depositor would have reasonably thought that information on the website about 360 PSAs — a different account type with a different name — would actually pertain to them. Nor would it have been "virtually impossible" to ascertain the difference in interest rates between the 360 MMA and the 360 PSA, where the 360 PSA interest rates were clearly posted on Capital One's website and where the 360 MMA interest rates were printed on every account statement and could presumably have been retrieved by calling Capital One. While Plaintiffs cite statistics suggesting that a majority of savings account holders would not ordinarily make such efforts, that fact does not imply that someone who actually sought the information would find it "virtually impossible" to obtain. This distinction between the instant case and the MDL is critical, given the emphasis placed by the Court on this facet of Capital One's conduct in the MDL. *Id.* at 703–04.

In sum, Plaintiffs fail to allege any actions taken by Capital One "to ensure that the Plaintiffs remained in the dark as to the truth," let alone a broader showing of dishonesty in how it exercised its express right to alter the terms of Plaintiffs' accounts with regard to 360 MMA interest rates. *Marcus*, 2022 WL 1527524 at *5. On this basis, the Court finds that Plaintiffs' allegations fail to establish that Capital One acted dishonestly in how it exercised its right to set interest rates, defeating Plaintiffs' claim under the Implied Covenant and requiring dismissal of Count 1.

### D. Statutory Claims (Counts II–VII)

Finally, the Court turns to Counts II through VII, which assert violations under the consumer protection and unfair trade practices statutes of Virginia, New York, Pennsylvania,

Illinois, Texas and New Jersey, respectively. (Am. Compl. ¶¶ 127–70.) Defendants argue that all six statutes share certain required elements, including a mandatory showing of deceptive conduct, and that the Amended Complaint fails to adequately plead several of these common elements. (Mem. at 25.)

In the MDL, this Court agreed that all six statutes implicated here require the Plaintiffs to plead deception in some form. MDL MTD Op. at 717 ("[W]hile each state statute might contain unique language to define unfair or deceptive acts or practices, the general requirements qualify as sufficiently similar to allow analysis of this issue across Plaintiffs' statutory claims.") The Court set forth the applicable standard for deceptive conduct under the relevant state statutes as follows:

> [T]he applicable standard for deceptive conduct consists of whether a "reasonable consumer" under the circumstances would likely be misled by the alleged deception. *See Kahn v. Walmart Inc.*, 107 F.4th 585, 598 (7th Cir. 2024) (noting that under the [Illinois Consumer Fraud and Deceptive Business Practices Act] (Count X), plaintiffs must allege that "the relevant labels are likely to deceive reasonable consumers, which requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled"); *see also Nolan v. Lab'y Corp. of Am. Holdings*, 2024 WL 1554760, at *7–8 (4th Cir. Apr. 10, 2024) (Fourth Circuit applying substantially similar "reasonable consumer" standard to deception claim under [Florida Deceptive and Unfair Trade Practices Act] (Count XII)). "In general, dismissal for failure to state a claim in this context is appropriate only where it is impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Dawson* [*v. Better Booch, LLC*], 716 F. Supp. 3d [949,] 956–57 [(S.D. Cal. 2024)].

*Id.* at 718 (footnote omitted). The parties do not dispute that this standard applies in the instant case. (Reply at 17–18; Opp. at 28.)

Plaintiffs maintain that they have adequately pled that Capital One "engaged in a wide variety of fraudulent, deceptive or unfair practices." (Opp. at 28 (internal quotation omitted).) Plaintiffs assert that, based on Capital One's marketing promises, "Plaintiffs reasonably believed

they would continue to receive a 'top,' 'higher' rate than that offered on other savings products" and that they "held Capital One's highest-interest savings product." (*Id.* at 29.) In Plaintiffs' view, 360 MMA depositors "had no reason to re-visit Capital One's website or regularly review their statements" (and thereby discover their lower-than-expected interest rates) "because Capital One told them not to do so." (*Id.*) Further, Plaintiffs again point to Capital One's "Banking Basics" website, which "continued to falsely represent . . . that money market accounts and high-yield savings accounts offered 'comparable' interest rates." (*Id.*) Finally, Plaintiffs assert that Capital One "rebuffed" any questions from accountholders who called its customer service agents, having instructed agents not to affirmatively mention 360 PSAs to 360 MMA customers. (*Id.*) Plaintiffs swat away Defendants' counterarguments on these points by claiming that the process to actually ascertain one's interest rates would have constituted "byzantine . . . detective work," (*id.* at 30), and that to be actionable, a deceptive statement does not necessarily need to be false when made. (*Id.* at 31.)

Capital One disagrees, arguing that the conduct at issue fails to rise to the level of deceptive conduct under the state statutes. Capital One highlights that "this case lacks the features of the MDL that the Court relied upon in finding that the plaintiffs in that case had adequately alleged deception." (Mem. at 26.) Specifically, Capital One highlights that the accounts at issue here had dissimilar names, structures, and features, and that there is "no basis to conclude here, as the Court did in the MDL," that Capital One's replacement of references to 360 Savings with references to the 360 PSA caused reasonable 360 MMA consumers to be confused about the distinction between their accounts and the 360 PSA. (*Id.*) Capital One also refutes Plaintiffs' assertions of deception on the basis that reasonable 360 MMA depositors would have been confused by the emergence of the 360 PSAs and would have "assumed that 360 MMA paid

a higher interest rate than 360 Performance Savings because it had previously paid a higher interest rate than 360 Savings." (*Id.*) Capital One highlights that no named Plaintiff alleges that they were so deceived. (*Id.*) More importantly, Capital One asserts that a reasonable investor would not have relied on interest rates for *other* account types to determine their own interest rates instead of simply checking their own rates on their account statements. (*Id.* at 26–27.) In addition, Capital One argues that no reasonable customer would believe that Capital One's statements about the "high" (or "higher") interest of the 360 MMA constituted a promise "that 360 MMA would always be Capital One's highest interest savings account" — particularly in the face of the 360 Disclosures, which expressly state that the interest rate would be variable at Capital One's discretion. (*Id.* at 27.) Finally, Capital One points out that, even under Plaintiffs' distorted reading of Capital One's marketing language, Capital One never told its customers *not* to visit its website "or to ignore the legal duty they have under the UCC, in Virginia and elsewhere, to monitor account statements." (Reply at 13–14 (citing Va. Code § 8.4-406(c)).)

The Court agrees with Capital One and finds that Plaintiffs fail to plausibly plead that a reasonable customer would have been misled by Capital One's allegedly deceptive actions. It arrives at this conclusion for many of the same reasons discussed *supra* regarding Count I. Again, the Court rejects Plaintiffs' invocation of language from Capital One's "Banking Basics" website, finding no basis to conclude that a reasonable customer would read these educational articles — framed in generalized terms and entirely devoid of references to Capital One's products — and reasonably believe that the generic statements contained therein would necessarily apply to their specific accounts. The Court similarly disregards Plaintiffs' arguments concerning Capital One's purported promises that 360 MMA customers could "rest easy" or "set

and forget" their money, since Plaintiffs' arguments significantly misrepresent the context surrounding these statements.

As to Plaintiffs' theory of deception based on Capital One's introduction of the 360 PSA in 2019, the Court again finds this theory to lack merit. The attenuated and implausible chain of inferences required by Plaintiffs' argument — which would require 360 MMA depositors to believe that (1) their 360 MMAs would forever earn a higher interest rate than 360 Savings accounts, (2) 360 PSA was the same as 360 Savings, and (3) on that basis, their interest rate would forever be higher than that earned by a 360 PSA depositor — dooms this theory of liability. None of the named plaintiffs in this action claim that they were actually deceived in this way, significantly undercutting this argument's persuasive force. Even if Plaintiffs had actually felt so deceived, the Court struggles to find a reasonable basis underpinning links (1) and (3) of this chain, given that Capital One made no express promise that 360 MMA would always remain its highest earning savings product, and given that any curious customer could have easily ascertained her interest rate simply by consulting her account statement or calling Capital One. The idea that a customer seeking to confirm her interest rate would instead consult and rely on *another account's* interest rate fails to comport with common sense. While Plaintiffs maintain that most savings accountholders would not bother to check their account statements and consequently would remain unaware of their current interest rate, that fact speaks to a lack of effort, not the difficulty of obtaining such information or any deception or obfuscation undertaken by Capital One in this regard.[12]

---

[12] While Plaintiffs highlight Capital One's directive to its customer service agents not to affirmatively advise 360 MMA depositors about the existence of a higher-earning account, Plaintiffs do not allege that this policy directed any Capital One employee to *conceal* the existence of such accounts. Nor do Plaintiffs allege that customer service agents were directed

That again leaves Capital One's statements that 360 MMA depositors were signing up for a "high interest" or "higher interest" account superior to Capital One's other savings products, and the allegation that Capital One stopped providing such interest rates to its 360 MMA customers after 2019. While Plaintiffs' argument that Capital One's statements proved deceptive presents a closer call, especially since several named plaintiffs allege that they expressly relied on these statements in opening 360 MMAs and maintaining funds in their accounts, (Am. Compl. ¶¶ 15–21), the Court nonetheless concludes that any such reliance falls short of the reasonableness standard required under the relevant statutes. First, as already discussed, Plaintiffs do not allege that Capital One failed to honor these promises when they opened their accounts; as such, any claims of deception relate only to the interest rate changes undertaken after 2019. To the extent that Capital One's statements constituted actual promises about the 360 MMA's interest rates, rather than mere puffery, nothing about these statements suggests that such rates would apply into perpetuity. Further, the Court finds that the 360 MMA Disclosures, which explicitly state that interest rates were variable and that Capital One could change these rates (and any other aspects of the account) as it pleased, would put any reasonable accountholder on notice that any such marketing promises would not, in fact, govern interest rates for the long term. Accordingly, the Court finds that a reasonable consumer would not have been misled into believing that her account would enjoy a permanently high interest rate or retain a higher interest rate than any other Capital One savings product in the future, dooming Plaintiffs' statutory claims.

---

not to inform 360 MMA customers about their interest rate, if asked. As such, the Court finds that the directives in question fail to constitute deception for purposes of the state statutes.

The facts of the Capital One MDL again provide a helpful reference point, illustrating why a different outcome is appropriate in this case. In the MDL, this Court concluded "that it is probable that the objective, reasonable consumer, acting reasonably in the circumstances, likely could be misled by the alleged deceptive conduct." MDL MTD Op. at 719 (internal quotation marks and citation omitted). The Court refuted Capital One's contention that its customers had access to all relevant information on its website and in their account statements, and that a reasonable consumer therefore "could not be misled." *Id.* The Court pointed out that such a reasonable accountholder "would need to first log in to their 360 Savings accounts, open their account statements and find their current APY in small print," would then "need to go to the Capital One website, open the specific webpage promoting Capital One's savings products and identify that the 360 Performance Savings account was a distinct product with a different interest rate, and not merely their same product with a new name, despite the fact that the two accounts bear nearly identical names and were never listed side-by-side anywhere on Capital One's website." *Id.* On that basis, the Court found that "only an incredibly attentive consumer would be able to identify the distinction between the accounts," and that the "objective, reasonable consumer" need not be such an "incredibly attentive consumer." *Id.* The Court also pointed to "the alleged experiences of the individual Plaintiffs," which demonstrated that the plaintiffs engaged in reasonable efforts to ascertain their interest rates, but that, despite these efforts and due to the confusion created by Capital One's bait-and-switch, they were misled into believing that they were earning the higher 360 PSA interest rate when Capital One was in fact paying them much less. *Id.* at 720.

The facts of the instant case prove distinct on all of the key issues flagged above. The core deception alleged in the MDL — that Capital One replaced all references to 360 Savings

accounts with references to the 360 PSA, intentionally failed to inform its existing 360 Savings accountholders of that fact, and then tanked the interest rate on the 360 Savings account, all while leaving 360 Savings accountholders to believe that they were earning strong rates based on the information that Capital One posted about the 360 PSA — simply did not occur here. Although Capital One did create a new account type in the 360 PSA, no reasonable 360 MMA customer would have been confused as to whether 360 PSA rates applied to his or her 360 MMA account, or would have believed that 360 MMA accounts were now 360 PSA accounts. More importantly, in seeking to ascertain the rate that 360 MMA depositors were actually earning at any given time, no reasonable 360 MMA depositor would have drawn conclusions about their rate based on the rates posted for the newly created 360 PSA. This stands in stark contrast to the MDL named plaintiffs' experience, where those plaintiffs made reasonable efforts to ascertain their interest rates, relied on the Capital One website's confusing representations and were misled into thinking that they received higher rates than they did. Here, Plaintiffs in this action allege that Capital One purportedly promised them permanently high interest rates, and then failed to keep that promise. Such alleged broken promises, without more, did not underly the Court's finding of deception in the MDL; they fail to establish such a finding here.

For all of these reasons, the Court finds that Plaintiffs' allegations do not establish the necessary element of deception required by their state statutory claims. The Court will therefore dismiss Counts II through VII for failure to state a claim.

## IV. CONCLUSION

For the reasons set forth above, the Court will GRANT Capital One's Motion to Dismiss (ECF No. 34). The Amended Complaint (ECF No. 31) will be DISMISSED WITH PREJUDICE.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Date: August 25, 2026